IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

LANE BRADLEY,

      Plaintiff,

vs.                                                            No. CIV 99-1149 MV/LFG

PATRICIA J. LOPEZ, DARRICK
SHAW, police officers with the City of
Tucumcari, and  AMERICAN
HOMEPATIENT, INC.,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant American Homepatient's Motion for Summary Judgment, filed May 11, 2000 **[Doc. No. 29],** Defendant Shaw's Motion for Summary Judgment on Slander and Defamation Claims, filed June 1, 2000 **[Doc. No. 42],** and Defendant Lopez and Shaw's Motion for Summary Judgment on Qualified Immunity for Fourth Amendment Claims, filed May 31, 2000 **[Doc. No. 38]**.  Having considered the moving papers, relevant law and being otherwise fully informed, the Court finds that the motions on the contract and defamation claims are not well taken and will be **denied** and that the motion based on qualified immunity is well taken and will be **granted**.

## BACKGROUND

This case arises from the search of Plaintiff Lane Bradley's work area by police officers Patricia Lopez and Darrick Shaw and the subsequent decision by his employer – Defendant American HomePatient, Inc. ("AHP"), to terminate Bradley's employment.  In Counts I and II of

the Complaint, Bradley charges Shaw and Lopez with searching his desk and van[1] and detaining

him in violation of the Fourth Amendment.  In Count III, Bradley brings a claim of slander and

defamation against Shaw for stating to AHP and in his police report that Bradley's desk had

previously contained controlled substances.  Count IV states a claim for wrongful termination

against AHP for terminating Bradley in violation of written and implied employment contracts.

Bradley seeks compensatory damages and costs.

For the purpose of resolving these motions, the Court finds that the following are the

undisputed material facts:[2]

1.      Bradley was employed at AHP as a service technician from May 1997 until his termination

        on December 18, 1998.  He was the sole AHP service technician in Tucumcari during his

        employment.  He worked in an office/warehouse and operated a company van.  Bradley's

        supervisors were located in Clovis.

Facts Related to Claim Against AHP

2.      At the beginning of his employment, Plaintiff signed a Confidentiality and Non-Solicitation

        Agreement with AHP.  The Agreement states that Bradley accepted employment with

        AHP and that he agreed: not to disclose confidential information obtained during his

        employment, to return when his employment terminated materials related to his

---

[1]In his response to the summary judgment motion based on qualified immunity, Bradley withdraws his claim that the officers' search of the AHP van violated his Fourth Amendment rights.  Accordingly, the Court will not consider this claim.

[2]The Court accepts as undisputed all facts admitted by both parties and all facts for which no competent contrary evidence has been presented by the opposing party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Mere assertions that a fact is or is not controverted are insufficient. *Id.*

employment, and during his employment and one year after leaving not to solicit AHP's

customers or employees.  Bradley had no other written contract with AHP.

3.  During his employment with AHP, Bradley received a copy of the AHP Handbook.  The

Introduction states, "[n]either this handbook nor any provisions in the handbook

constitute a contract of employment or any other type of contract.  *AHP Handbook*, at 2.

The section entitled "Employment at Will" states:

> all employees of the Company are at will and as such, are free to
> resign at any time without reason.  The Company likewise, retains
> the right to terminate an employee at any time with or without
> notice.  Nothing contained in the manual or any other document
> provided to the employee is intended to be, nor should it be,
> construed as a guarantee that employment or benefits will be
> continued for any period of time.

*Id.* at 4.  The Handbook also contains a section entitled "Rules of Conduct" which

specifies certain impermissible conduct and how it will be addressed.  The rule violations

are broken organized into three groups.  According to the Handbook, violating the rules

set forth in Group A may result in immediate discharge, those in Group B will result in

written reprimand and may result in more severe dismissal depending on the circumstances

and the employees work record, and those in Group C will result in verbal reprimand and

may result in more severe reprimand depending on the circumstances and the employees

work record.   The "Rules of Conduct" section also states:

> As it is not possible to list every conceivable infraction or to
> anticipate the circumstances under which the infraction will take
> place, employees should not view these lists as all-inclusive or as
> specifying the only appropriate discipline.  It is anticipated that
> incidents of misconduct not listed will arise that necessitate
> disciplinary action . . . While discipline is normally progressive in
> nature, the Company reserves the right to terminate any employee
> at any time without prior warning as the situation warrants in the

> sole discretion of the Company. . . . Neither these rules nor other
> policies are a contract or other promise of employment and in no
> way alter the fact that employment is terminable at will and can be
> severed by either party at any time for any reason not prohibited by
> law.

*Id.* at 21-23.

4.    Bradley learned his job quickly.

5.    In June 1998, Bradley requested vacation time.  The general manager, Bryan Ellis, denied

the vacation time.  Bradley appealed this denial and was granted a portion of the vacation

time he had initially requested.  Ellis was upset that Bradley appealed his decision.

6.    Sometime in 1998, Elsie Alexander, a supervisor at AHP, contacted her brother Leroy

Prieto, who was a dispatcher at the Tucumcari Police Department and told him that she

received a complaint that Bradley was selling drugs from the AHP warehouse in

Tucumcari.  She asked Prieto if the Tucumcari Police could monitor the warehouse.

Before calling her brother, Alexander asked Ellis if it was permissible for her to call her

brother and request that the police watch the building.

7.    After Alexander told Prieto about complaints about Bradley, agents from the Tucumcari

Police Department obtained permission from AHP to search the Tucumcari warehouse

and did so.  No drugs were found, though a drug dog did "alert" at Bradley's desk.  The

police report indicated that illicit drugs had been stored in the desk.

8.    As a result of this report, AHP requested that Bradley submit to a drug test.  Alexander

suggested to Bradley that the test would "clear his name" and that the company would

stand by him and support him.  Bradley submitted to the test which did not indicate any

drug use.

9.      AHP terminated Bradley's employment in part because of the police search and the
conclusion in the police report that there had been illicit drugs in Bradley's desk.

10.     Ellis generally complies with AHP's personnel policies in disciplining and discharging
employees.

11.     AHP followed its policies in disciplining Bradley prior to his termination, filling out
"Employee Corrective Action Report" forms which described the facts leading to the
corrective action, listed the steps Bradley was supposed to take to correct his mistakes,
and noted what level of discipline the report recorded, e.g. verbal reprimand, written
warning/final warning, or termination.

12.     An "Employee Corrective Action Report" dated October 20, 1999 indicated that any
further insubordination by Bradley would result in immediate termination.

13.     Ellis believed when Bradley was asked to submit to a drug test that there was sufficient
evidence for reasonable suspicion under AHP policy to request the test.

Facts Related to Claims Against Officers Lopez and Shaw

14.     Sergeant Patricia Lopez was a seven-year veteran of the Tucumcari Police Department.

15.     Officer Lopez had heard rumors that Bradley was dealing drugs.  After hearing these
rumors, a confidential unpaid tipster told Officer Lopez that Bradley was using the AHP
van to deliver marijuana.  On December 9, 1998 the same informant contacted Officer
Lopez and advised her that he had a friend who worked at AHP and that AHP had
received a number of complaints about Bradley.[3]

---

[3]Officer Lopez and Shaw also point, in their motion, to what they characterize as a third
tip from a second confidential informant.  This alleged "tip" consisted of the informant stating that
his wife had been in a business called Bargain Barn at the same time Bradley was there and that
she smelled the odor of acetone which, according to the informant, is used to process cocaine.  A

16.     After receiving this tip on December 9, 1998, Officer Lopez contacted AHP to request

consent to search the warehouse and van where Bradley worked.  Bryan Ellis, the General

Manager for southern New Mexico at AHP, was the highest ranking employee responsible

for Tucumcari.  He gave Officer Lopez consent to search the entire AHP warehouse and

van in Tucumcari.  The warehouse contained oxygen tanks, hospital beds, and rental

equipment which was the property of AHP.  Ellis did not place any restrictions on Lopez'

search and did not indicate that any areas were Bradley's private workplace which should

not be searched.

17.     The AHP warehouse contained a small room with a desk, copy machine, and fax machine.

Bradley used the desk as the sole AHP employee assigned to Tucumcari and had a picture

of himself and his wife on the desk.  There were no other personal items on the desk.

Other AHP employees had access to and used the desk, copy machine, and fax machine

when they were in Tucumcari.  Bradley did not have a key to the desk or the room.

Bradley's name was neither on the desk nor on the door.

18.     The van was owned by AHP.  Bradley drove the van in the course of his employment with

AHP and other employees also had access to and drove the van.  Bradley only used the

van for AHP business, not for personal matters.

19.     On December 9, 1998, after Ellis gave his consent to search the AHP warehouse, Officer

Lopez began the search.  Because the building was filled with boxes Officer Lopez called

---

statement by an unknown informant's wife while she was in the same public business as Bradley
she believes she smelled a substance which she asserts is used in the processing of cocaine does
not come close to indicating that Bradley was involved in processing or dealing illegal drugs.
Officer Lopez neither knows nor investigated whether acetone is in fact used to process cocaine
and smelling the odor in a public place where Bradley was cannot reasonably implicate him in any
wrongdoing.  It is far too attenuated and therefore will not be considered.

for the Tucumcari Police Department Canine Officer to expedite the search.

20.    Darrick Shaw is a Corporal with the City of Tucumcari Police Department.  He was the dog handler at the time of the AHP search, handling canine Eeno.  Officer Shaw was Eeno's first handler and had been Eeno's handler for approximately one and one-half years at the time of the search.  Eeno is a Belgian Malenois – a breed commonly used for narcotic detection.

21.    Eeno was trained by Officer Shaw.  Officer Shaw and Eeno were twice certified together as dog and handler to search for cocaine and marijuana through the National Narcotic Drug Dog Association.  The second certification was on October 23, 1998 – two weeks before the AHP search.

22.    Eeno has several times alerted when no narcotics have been found.  At the San Jon port of entry, Eeno falsely alerted to the console of a pickup truck when there was beef jerky found inside the console.  Eeno's alert was on the smell of the beef jerky.  Eeno falsely alerted on an automobile's left rear door panel.  When searched, the door panel contained candy on which Eeno alerted.  One year prior to the AHP search, Eeno alerted on the scent of plastic baggies as well as on dog food.  Ten months before the events giving rise to this action, Eeno alerted on prescription medications.

23.    Officer Turrietta took over from Officer Shaw as Eeno's dog handler.  While working with Turrietta, Eeno alerted on a Mercedez Benz on Interstate 40 where no narcotics were found and alerted several times on a house where no illegal drugs were found.  By Officer Turrietta's estimation, while he was Eeno's handler, Eeno alerted at least eight other times when no narcotics were found.

24.     From Officer Shaw's training and experience, the odor of cocaine can remain in a closed space for one week and the odor of marijuana can remain for up to two weeks.  Officer Shaw was trained regarding the length that narcotic odor can last by three knowledgeable sources – William Corcoran who raises and trains dogs for police work in Los Alamos; the Director of the Bernalillo County Sheriff Department, Canine Unit; and a K-9 Training Seminar in Kansas.

25.     Officer Shaw came to the AHP warehouse with canine Eeno.  During the search of a desk in a small office room, Eeon had a strong alert on the desk drawer, but when the drawer was searched no narcotics were found.

26.     After Eeno alerted to the desk, Bradley arrived at the warehouse.  Officer Lopez advised him that they were searching the building with permission of AHP.  Officer Shaw told Bradley that the dog had alerted on the desk and asked if the desk belonged to Bradley. Bradley explained that the desk had been at the warehouse since he began working there, that he used the desk, and that other AHP employees used the desk.

27.     While Officer Shaw was searching the desk, Bradley told Officer Lopez that he wanted to go home.  Officer Lopez told him to stay at the warehouse because they wanted to search the AHP van parked at Bradley's home.  In five or ten minutes, after no drugs were found, the officers followed Bradley to his home to search the van.

28.     Bradley unlocked the van.  Officer Shaw took Eeno through the van and Eeno alerted on an oxygen concentrator in the van.  The concentrator was searched and no drugs were found.

29.     Officers Lopez and Shaw wrote a police report addressing their search of AHP.  Officer

Shaw's portion of the report states that the dog alerted on the desk drawer and that nothing was found.  The report goes on to state, "by the method of Eeno's alert I do believe that a form of narcotic, or controlled substance, have [sic] recently been kept there."

30.    After the search, Officer Shaw had no contact with anyone at AHP regarding the search or its results and did not send the Police Report to AHP.  AHP did receive the Police Report.

## LEGAL STANDARD

Summary judgment is an integral part of the Federal Rules of Civil Procedure, which are intended to "'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed.R.Civ.P. 1).  Under Rule 56(c), summary judgment is appropriate when the court, viewing the record in the light most favorable to the non-moving party, determines that "there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Thrasher v. B&B Chemical Co.*, 2 F.3d 995, 996 (10th Cir. 1993).  The movant bears the initial burden of showing "there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). Once the movant meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the material submitted by the parties in support of and in opposition to the

motion must be construed liberally in favor of the party opposing the motion, *Harsha v. United States*, 590 F.2d 884, 887 (10th Cir. 1979), the burden on the moving party may be discharged by demonstrating to the district court that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. In such a situation, the moving party is entitled to judgment as a matter of law, "because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 322.

## DISCUSSION

### I. Implied Contract

In New Mexico, unless an employee has an explicit contract providing otherwise, employment is presumed to be terminable at-will by either the employer or employee. *See Kiedrowski v. Citizens Bank*, 119 N.M. 572, 575 (Ct. App. 1995) (citing *Melnick v. State Farm Mutual Automobile Insurance Co.*, 106 N.M. 726, 730 (1988)). This means that '[a]n at-will employment relationship can be terminated by either party at any time for any reason or no reason, without liability." *Lihoust v. I & W, Inc.*, 121 N.M. 455, 457 (Ct. App. 1996) (citing *Harbarger v. Frank Paxton Co.*, 115 N.M. 665, 668 (1993)). The New Mexico courts have carved out two exceptions to the at-will employment doctrine. First, an employee may have an implied contract where the employer represented that there are restrictions on its ability to terminate employees. *Kiedrowski*, 119 N.M. at 575. Second, an employee may state a claim for wrongful termination in violation of public policy, also called retaliatory discharge. *Melnick*, 106 N.M. at 730. Bradley argues he had both a written and an implied employment agreement with AHP.

Bradley asserts that the Confidentiality and Non-Solicitation Agreement was a valid, enforceable contract which created legally enforceable rights and duties between Bradley and AHP, but fails to specify the nature of these rights and duties.  The Court finds that the Confidentiality and Non-Solicitation Agreement was not, by itself, an employment contract obligating AHP to only terminate Bradley's employment for certain reasons.  The agreement provides that if AHP employs Bradley he must agree not to interfere with AHP's business in certain ways such as not disclosing confidential business information or soliciting AHP customers or employees.  It is a legally enforceable agreement because AHP provides consideration in the form of employing Bradley.  However, it does not govern the circumstances under which AHP may terminate Bradley nor requires AHP to employ Bradey for a specific period of time.

Next, the Court turns to the implied contract claim.  An employee handbook may create an implied contract.  *Garcia v. Middle Rio Grande Conservancy*, 121 N.M. 728, 731 (1996) (citing *Forrester v. Parker*, 93 N.M. 781, 782 (1980)).  The Handbook that Bradley received from AHP includes several disclaimers stating that the handbook does not create an employment contract and that all employees are "at-will" employees.  AHP argues that it reserved the right to discharge employees at any time for any reason, and that the disclaimers in it handbook, as in *Paca v. K-Mart Corp.*, 108 N.M. 479 (1989), preclude a finding of an implied contract.  In *Paca*, 108 N.M. at 480-81, the New Mexico Supreme Court held that an employee handbook did not create an implied contract on several bases – that the handbook applied only to hourly employees whereas the plaintiff was a salaried employee; that the plaintiff was not given a copy of the handbook and therefore could not reasonably rely upon it; and that the handbook stated that employees were terminable at will.  However, in a later case, the New Mexico Supreme Court

explained that "'[a] contractual disclaimer does not automatically negate a document's contractual status and must be read by reference to the parties' norms of conduct and expectations found upon them.'"  *McGinnis v. Honeywell, Inc.*, 110 N.M. 1, 6 (1990) (quoting *Zaccardi v. Zale Corp.*, 856 F.2d 1473, 1476-77 (10th Cir. 1988)).  Accordingly, an employee handbook may create an implied contract even if it includes a disclaimer if the employer's conduct, including the handbook, leads employees to reasonably believe that they will only be terminated after certain procedures are followed.  *See Kiedrowski*, 119 N.M. at 572.

The *Kiedrowski* court explained that "[o]rdinarily, what constitutes a party's 'reasonable expectations' based upon 'norms of conduct' and employer representations, is a question of fact for the jury, thereby defeating any resolution by summary judgment.  *Id.* (citing *Hartbarger v. Frank Paxton Co.*, 115 N.M. 726, at 671-72 n.5 (1993)).  However,  the court also clarified that an employee's expectations must be objectively reasonable.  *Id.* (citing *Kestenbaum v. Pennzoil Co.*, 108 N.M. 20, 23 (1988).  The totality of the circumstances must be examined to determine whether the at-will presumption has been altered.  *Id.* (citing *Kestenbaum*, 108 N.M. at 26).  In *Kiedrowski*, the court denied the employer's summary judgment motion where the employee handbook at issue included detailed disciplinary procedures that managers were required to follow and the Plaintiff stated in her affidavit that, as a manager, she had been instructed by the employer to follow the disciplinary procedures set forth in the handbook.  *Id.* at 576.

In support of his claim, Bradley points to deposition testimony by Ellis that he usually follows the Employee Handbook in deciding whether to discipline or discharge employees, Alexander's statement that taking the drug test would clear his name and that the company would stand by him, AHP's reliance on its policies in disciplining Bradley prior to his termination, the

requirement that Bradley sign the confidentiality agreement, and Ellis's belief, when Bradley was asked to submit to a drug test that there was reasonable suspicion under the company policy to request this test.  Because of these facts, Bradley asserts, he believed that AHP would only terminate him for a good reason.

The Court finds that, taken together, the facts relied upon by Bradley in support of his implied contract claim, are sufficient to survive summary judgment.  As in *Kiedrowski*, in this case Bradley received a Handbook which outlined disciplinary procedures.  Ellis had applied these procedures in disciplining Bradley prior to his termination, which led Bradley reasonably to believe that AHP would continue to rely on its procedures.  Further supporting Bradley's claim are the confidentiality agreement he was required to sign, and the statements by Alexander that taking the drug test would clear his name and that the company would stand by him.  Though the Court is aware of the statements in the AHP Handbook that the document did not create an employment contract and that all employees were "at-will,"  the totality of AHP practices and statements together led Bradley to reasonably assume that he would only be terminated for violating company policies.

In its motion AHP argues only that there was no implied contract that it would only terminate Bradley for good cause.  AHP does not assert that it in fact had good cause to terminated Bradley.  Therefore, the Court will not reach this latter issue.  AHP's reply brief conclusorily states that Ellis complied with the Handbook in discharging Bradley for "other problems," but this assertion is insufficient because the Court finds that Bradley had an implied contract with AHP that it would only terminate him for violating a specific policy.  Accordingly, the Court denies AHP's summary judgment motion on the contract claim.

13

**II. Qualified Immunity on Fourth Amendment Claims**

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800 818 (1982) (*citing Procunier v. Navarette*, 434 U.S. 555, 565 (1978); *Wood v. Strickland*, 420 U.S. 308, 322 (1975)). The application of this standard varies depending on the claim alleged and must be assessed based on the particular facts of the case. In the summary judgment context, once a public official raises a qualified immunity defense, the plaintiff bears the burden of coming forward "with facts or allegations sufficient to show both that the defendant's alleged conduct violated the law and that the law was clearly established when the alleged violation occurred." *Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 646 (10th Cir. 1988). For plaintiffs to prevail against an assertion of qualified immunity "the contours of an asserted right must have been sufficiently clear that reasonable officials in their positions would understand that their actions would violate that right." *Baptiste v. J.C. Penney Co.,* 147 F.3d 1252, 1255 (10th Cir. 1998) (*quoting Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Plaintiff is not required to show that the very conduct in question has previously been held unlawful. *See Anderson*, 483 U.S. at 640. Rather, he is required to demonstrate that the unlawfulness was "apparent in light of established law." *Id.*

In *Anderson*, 483 U.S. 635, the Supreme Court considered the application of qualified immunity in warrantless search cases. In explaining how the "clearly established" violation should be determined, the Court stated, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640.

14

However, the fact that, for example, it is well established that searching a home without probable cause or exigent circumstances violates the Fourth Amendment does not settle that an officer's warrantless search was unreasonable for qualified immunity purposes.  Rather, the relevant inquiry "is the objective (albeit fact-specific) question whether a reasonable officer could have believed [the defendant officer's] warrantless searches to be lawful, in light of clearly established law and the information the searching officers possessed."  *Id.* at 641.  Even officers who "reasonably but mistakenly conclude that probable cause is present" are entitled to immunity.  *Id.*   The Court made clear that it was important to assess the reasonableness of the officer's belief based on the particular circumstances and the information he or she had at the time.

In this case, Officers Lopez and Shaw assert that they reasonably believed that their search of the AHP warehouse and van, including the desk that Bradley used, was valid because Lopez had received unrestricted consent for the search from Ellis.  Even if Ellis did not have actual authority to consent to the search of the desk, the officers assert that under the doctrine of apparent authority, they believed that Ellis had authority to grant consent and are therefore entitled to qualified immunity.

In *Illinois v. Rodriguez*, 497 U.S. 177 (1990), the Supreme Court outlined when third-party consent searches are valid under the apparent authority doctrine.  The Court held that if an officer enters without a warrant reasonably though wrongly believing that the third party who granted consent to the entry had authority to grant that consent, the Fourth Amendment is not violated.  *Id.* at 186-88.  Essentially then the consent of a third party to search a common premises is valid if the third party has either actual or apparent authority to grant the consent to search.  *Id.* at 188.  Relying on *Illinois*, Officers Lopez and Shaw argue that they reasonably

believed that Ellis had the legal authority to allow the search of the warehouse, including the desk, and that therefore their search was valid under the Fourth Amendment.

Bradley does not analyze the apparent authority argument and cases relied upon by the officers. Rather, he conclusorily asserts that "there can be no apparent authority" because he had a reasonable expectation of privacy in his work desk. *Plaintiff's Response*, at 4. However, even if a plaintiff has a reasonable expectation of privacy in a desk or area, the Fourth Amendment is not violated under clear Supreme Court jurisprudence if a third party gave consent to search the area and the officer reasonably believed that the third party had the authority to grant this consent. To defeat the summary judgment motion based on qualified immunity Bradley must show that Officers Lopez and Shaw could not reasonably have believed that Ellis had the authority to grant consent to search the desk used by Bradley.

The Court first will examine the parameters of workplace privacy and then the issue apparent authority. It is well established that private employees have a reasonable expectation of privacy in their workplaces. *Mancusi v. DeForte*, 392 U.S. 364, 369 (1968); *United States v. Leary*, 846 F.2d 592, 595 (10th Cir. 1988) ("There is no doubt that a corporate officer or employee may assert a reasonable or legitimate expectation of privacy in his corporate office"); *Specht v. Jensen*, 832 F.2d 1516, 1520 (10th Cir. 1987). The individual circumstances of a workplace must be assessed, such as who has access to an office, in determining the reasonableness of an employees' privacy interests. In *Ortega*, where other employees had access to the employee's office and the employee kept his personal papers in the desk, the Court held that he still had a reasonable expectation of privacy in his desk and files. *O'Connor v. Ortega*, 480 U.S. 709, 719 (1987)*; see also United States v. Taketa*, 923 F.2d 665, 673 (9th Cir. 1991)

("the access of others does not defeat [an employee's] expectation of privacy in his office").  In

*Tarketa*, the Court held that the fact that another had a key to the plaintiff employee's desk and

that he did not always lock his office did not defeat his expectation of privacy.  *Id.*  The Tenth

Circuit has further held that an employee had an expectation of privacy in an empty room in his

workplace where he went on the weekend and thought he would be alone.  *United States v.*

*Anderson*, 154 F.3d 1225, 1229-33.

Regardless of this expectation of privacy, Officers Shaw and Lopez argue that they

reasonably believed that Ellis had given valid consent to search the entire warehouse – including

the desk, and that therefore they are entitled to qualified immunity on the unreasonable search

claim.  Under the qualified immunity standard, summary judgment is proper if Officers Lopez and

Shaw could reasonably have believed that Ellis had the authority to consent to a search of the

desk.  Following this standard and *Illinois v. Rodriguez* as it must, the Court agrees that under the

apparent authority doctrine, the officers could reasonably have believed that Ellis had authority to

consent to a search of the entire warehouse, including the desk used by Bradley.  The facts are

undisputed that Ellis was the AHP supervisor who managed the Tucmcari office and that he gave

unrestricted consent to Officer Lopez to search the warehouse.  The desk in question was

primarily used by Bradley and had a picture of him and his wife, but there were no other personal

items on the desk.  The desk did not have Bradley's name on it and neither the desk nor the office

were locked.  In addition to Bradley, other AHP employees also had access to and used the desk

when they were in Tucumcari.  Bradley has failed to meet his burden of showing that Officers

Lopez and Shaw violated his "clearly established" rights as required for a summary judgment

motion based on qualified immunity.  *Pueblo Neighborhood Health Ctrs.,* 847 F.2d at 646.

Though arguing that he had a privacy interest in his desk, a claim not disputed, Bradley has not come forward with any facts undermining the officers' assertion that they believed Ellis could and did consent to a search of the entire Tucumcari warehouse, including the desk used by Bradley. Given that there were no indications that the desk was Bradley's private desk other than one picture and that when the officers asked Bradley if the desk was his he replied that others used it as well, the officers could reasonably have concluded that it was not his private desk and that Ellis had the authority to grant consent to search it.  For these reasons, the Court will grant summary judgment for Defendants as to Count I.

Next, the Court turns to Count II in which Bradley alleges that the officers' detention of him for five to ten minutes at the warehouse while they completed the search violated the Fourth Amendment.  The officers argue that their detention of Bradley was proper because he was detained only after Eeno alerted to the desk and was detained only long enough to allow them to search the desk and have Bradley take them to the company van.  The officers argue that they had heard rumors and tips that Bradley was dealing drugs out of the van and had a reasonable suspicion that Bradley would destroy evidence of drug activity in the van.  They assert that this suspicion warranted the detention.

Bradley counters that the search of the desk drawer to which Eeno had alerted relealed no illegal substances, and therefore the officers had no reasonable suspicion to believe that he was engaged in illegal activity.  Bradley further asserts that the tips upon which the officers rely were unreliable, uncorroborated, and from a source without personal knowledge.

To comply with constitutional parameters, an investigative detention must be of limited scope and duration and be supported by a reasonable suspicion of criminal activity.  See *United*

*States v. Sokolow*, 490 U.S. 1, 7 (1989). The officer need not have probable cause but "'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *United States v. Davis*, 94 F.3d 1465, 1468 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). The officer must have "something more than an inchoate and unparticularized suspicion or hunch." *Id.* (quoting *United States v. Melendez-Garcia*, 28 F.3d 1046, 1051 (10th Cir. 1994)) (internal quotation marks omitted). Here, the officers rely on the tips Officer Lopez received that Bradley was dealing drugs out of AHP property and the fact that the dog alerted to the desk to support their position that they had reasonable suspicion of criminal activity to support their brief detention of Bradley. The Court gives little weight to the rumors and tips Officer Lopez heard, but finds that once the dog had alerted to the desk, the officers were justified in detaining Bradley until they could search the desk. Under the qualified immunity standard which the Court must apply, Bradley must show that in detaining him, the officers violated clearly established law. Bradley points to no case law holding that detaining someone after a dog has alerted to the property that they use is clearly impermissible. Rather, the Court finds that the officers could have reasonably believed after Eeno alerted to the desk that this created the reasonable suspicion needed to justify a ten minute detention while they searched the desk and went with Bradley to his home to search the van. In fact, an alert by dog trained and certified in narcotics detection has been held sufficient to establish probable cause for a search warrant. *United States v. Kennedy*, 131 F.3d 1371, 1376-78 (10th Cir. 1997). Bradley having failed to meet his burden on the qualified immunity motion, the Court will grant summary judgment as to Count II.

**III. Slander and Defamation Claims**

As an initial matter, Officer Shaw urges this Court to remand this case to state court if it dismisses Bradley's civil rights claims, noting that without the Fourth Amendment claims, this Court will no longer have federal question subject matter jurisdiction.  Bradley opposes the remand and urges this Court to exercise its discretion to maintain jurisdiction over the case, which the Court will do given the late stage of this litigation set for trial next month.  *See Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 541 (10th Cir. 1995) (district court has discretion to try state claims in absence of any triable federal claims and should consider expense and delay caused by remanding case to state court).

Bradley's Complaint charges that Shaw defamed him in two ways –  by relating to AHP that he believed that there had been narcotics in Bradley's desk and by making the same assertion in his police report.  According to the undisputed facts, Officer Shaw did not have any contact with AHP after the search.   Therefore, the Court will not consider Bradley's complaint that Shaw made defamatory statements, but will only assess the claim that his police report was defamatory.

Officer Shaw asserts that summary judgment is proper on three bases.  First, he argues that the report is protected by a qualified privilege as a matter of law.  UJI 13-1012.  Shaw states that Bradley can only overcome the privilege by proving that Shaw knew the report was false or acted with reckless disregard as to the truth of the report.  Shaw asserts that according to his training and experience, Eeno's strong alert on the desk drawer meant that illegal drugs had recently been kept there, as his report reflects.  Second, Shaw argues the defamation claim must fail because his statement was true and truth is a defense to defamation.  Shaw's argument relies on his assertion that his statement that he "believed"there were controlled substances in the desk was an opinion and an opinion cannot support a defamation claim.  Third, Shaw contends

summary judgment is proper because Bradley suffered no harm to what Shaw characterizes as Bradley's already-poor reputation.  Taking these arguments in reverse order, the Court need not consider in depth this last argument because it is undisputed that Bradley lost his job in part because of Shaw's statements in the report.  This is sufficient injury to support a defamation claim.  See UJI 13-1010.

Next, the Court will address whether Shaw has adequately stated a truth defense and whether the defamation claim fails because the statement was an opinion.  Because the plaintiff in this case is a private citizen, not a public figure, the defendant bears the burden of proving that his statement is true.  UJI 13-1013.  Shaw has not met this burden, relying instead on the fact-opinion distinction.  Shaw asserts that his statement is an opinion because it was stated as something he "believes."  Bradley disagrees, arguing that the statement, though expressed as a belief, is based on Eeno's training to only alert to the smell of narcotics.  Further, Bradley asserts that Shaw knew this conclusion that Eeno would only alert if there had been drugs in the desk to be false given what Bradley characterizes as Eeno's history of false alerts.

Whether a statement is a fact or an opinion for purposes of a defamation claim is determined by examining the facts upon which the statement is based.  "'[I]f the material as a whole contains full disclosure of the facts upon which the publisher's opinion is based and which permits the reader to reach his own opinion, the court in most instances will be required to hold that it is a statement of opinion and absolutely privileged." *Marchiando v. Brown*, 98 N.M. 394, 404 (1982) (quoting *Kutz v. Independent Pub. Co., Inc.*, 97 N.M. 243, 245 (Ct.App. 1981)). "Conversely, where there are implications in the statement 'that the writer has private, underlying knowledge to substantiate his comments about plaintiff,' and such knowledge implies the

existence of defamatory facts, the statement is deemed to be factual and not privileged." *Id.*
(quoting *Kutz*, 97 N.M. at 246). If, applying this standard, it is clear that a statement is fact or
opinion, the Court should make this determination as a matter of law. *Id.* (citing *Bindrim v.
Mitchell*, 92 Cal.App.3d 61, 77-78, 155 Cal.Rptr. 29, 39 (1979)). If, however, this determination
is not unambiguously clear, the jury should decide whether the statement is fact or opinion.

The Court finds in the instant case that the determination whether Shaw's statement that
he believed there had recently been drugs in the desk was a fact or opinion should be decided by
the jury. The Court finds persuasive Bradley's argument that Shaw's statement was based on his
assessment of Eeno's training which must be examined in greater detail. Bradley has presented
undisputed facts showing that Eeno several times falsely alerted to items such as dog food, plastic
baggies, candy, and beef jerky. Though Shaw argues that this is insufficient to undermine Eeno's
training and therefore Shaw's statement, he has not presented the Court with any information
regarding normal rates of false alerts for narcotic detection dogs or the training process.
Therefore, summary judgment on the basis that the statement is an opinion is not warranted.

Last, the Court turns to whether a qualified privilege applies to Shaw's statement. Shaw
argues that the privilege applies because he prepared the report in discharge of his public duty as a
law enforcement officer. Bradley counters that because the report was not used to prosecute him,
the privilege does not apply. The New Mexico Civil Uniform Jury Instructions define the
qualified privilege as follows, "[a] communication is normally privileged when it consists of a
good faith publication in the discharge of a public or private duty." UJI 13-1012. There are
several circumstances under which the privilege does not apply because the defendant is deemed
to have abused the privilege, including if the defendant knew the statement was false, acted with

reckless disregard for the truth or falsity of the statement, or did not have reasonable cause to believe the statement was true. *Id.* Whether the privilege applies is for the court to decide as a matter of law, but whether the privilege was abused is for the jury to determine. *See Baker v. Bhajan,* 117 N.M. 278, 283 (1994) (citing *Stewart v. Ging*, 64 N.M. 270, 274 (1958)).

The Court finds that the qualified privilege does apply in this case. Though the police report was not used to bring charges against Bradley, it can hardly be argued that he did not write the report in discharge of his duties as a police officer. However, whether Shaw abused that privilege is an issue for the jury to decide. Bradley has created a genuine issue of material fact on the abuse question by pointing to numerous instances in which Eeno alerted falsely, thus undermining the reasonableness of Shaw's conclusion that he believed there had been narcotics in the desk.[4] For the foregoing reasons, Shaw's motion for summary judgment on the defamation claim will be denied.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant American Homepatient's Motion for Summary Judgment **[Doc. No. 29]** is hereby **denied**; Defendant Lopez and Shaw's Motion for Summary Judgment on Qualified Immunity for Fourth Amendment Claims **[Doc. No. 38]** is hereby **granted,** and Counts I and II are hereby **dismissed**; and Defendant Shaw's Motion for

---

[4]Shaw challenges the current Uniform Jury Instruction's standard for finding that a defendant abused his qualified privilege. Under UJI 13-1012, a jury is instructed to find abuse of the privilege if the defendant did not have reasonable cause to believe the statement was true. Shaw argues that this negligence standard is no longer good law, relying on the Committee Comment criticizing the inclusion of this negligence standard. However, New Mexico courts have continued to include the negligence standard. *See Baker*, 117 N.M. at 283. If this case goes to trial, the Court will consider arguments from both parties regarding the proper standard for abuse of the qualified privilege in defamation cases. The parties should be prepared with specific arguments supported by case law on this issue.

23

Summary Judgment on Slander and Defamation Claims **[Doc. No. 42]** is hereby **denied**.

    **DATED** this 18th day of September, 2000.

 

_____
MARTHA VAZQUEZ
U. S.  DISTRICT JUDGE

Attorneys for Plaintiff:
Joseph Kennedy and Shannon Oliver

Attorney for Defendants Lopez and Shaw:
M. Clea Gutterson

Attorney for Defendant American Home Patient, Inc.:
Charles J. Vigil and Jeffrey Lowry